# In the United States Court of Appeals for the Eighth Circuit

SANDRA K. FIECKE-STIFTER and the ESTATE OF DORIS M. FASCHING,
by and through personal representative SANDRA FIECKE-STIFTER,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

MIDCOUNTRY BANK; TAFT STETTINIUS & HOLLISTER LLP,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
Case No. 22-cv-03056 (The Hon. Eric C. Tostrud)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

CARL ERIC CHRISTENSEN
CHRISTOPHER WILCOX
CHRISTENSEN SAMPSEL PLLC
305 Fifth Avenue, North
Suite 375
Minneapolis, MN 55401
(612) 473-1200
*carl@christensensampsel.com*
*chris@christensensampsel.com*

MATTHEW W.H. WESSLER
ROBERT D. FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*robert@guptawessler.com*

THOMAS JOHN LYONS, JR.
CONSUMER JUSTICE CENTER, P.A.
367 Commerce Street
Vadnais Heights, MN 55127
(651) 770-9707

June 27, 2025                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of authorities ........................................................................................... ii

Introduction ........................................................................................................ 1

Argument ............................................................................................................ 3

I.    MidCountry's defense of the district court's dismissal of
Sandra's TILA claim conflicts with the statute's text and
the complaint's allegations ................................................................. 3

    A.    Section 1639f does not permit servicers to assess late
fees for timely payments .......................................................... 3

    B.    Sandra adequately alleged that MidCountry charged
her a late fee ..............................................................................12

II.    Taft's defense of the dismissal of Sandra's FDCPA claim
conflicts with Minnesota law and FDCPA caselaw more broadly .......15

    A.    Taft's "requisite"-procedure distinction has no footing
in Minnesota law ...................................................................... 16

    B.    Minnesota law does not permit debt collectors to
maintain a "present right to possession" by preventing
homeowners from curing defaults............................................ 19

    C.    Taft's "requisite"-procedure distinction conflicts with
numerous cases holding that the failure to follow
mandatory state-law requirements for taking collateral
cuts off a "present right to possession." ...................................23

    D.    This case will not unduly expand the FDCPA..........................26

Conclusion ........................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*Adlinger v. Close,*
201 N.W. 625 (Minn. 1925) .................................................. 17, 18, 19, 21

*Amodio v. Ocwen Loan Servicing, LLC,*
2019 WL 2162944 (M.D. Tenn. 2019) ............................................20

*Barber v. Law Offices of Thomas J. Burbank,*
2023 WL 4281241 (E.D. Tex. 2023) ..............................................23

*Bohannon v. PHH, Mortgage Corp.,*
2012 WL 12844753 (N.D. Ga. 2012) .............................................24

*Boyle v. United States,*
556 U.S. 938 (2009) ..................................................................7

*Coles v. Yorks,*
17 N.W. 341 (Minn. 1883) .........................................................18

*Davis v. Davis,*
196 N.W.2d 473 (Minn. 1972) ....................................................21

*Fridman v. NYCB Mortgage Co.,*
780 F.3d 773 (7th Cir. 2015) ....................................................7, 8

*Hill v. Nationstar Mortgage LLC,*
2022 WL 16950025 (E.D. Va. 2022) ..........................................23, 26

*In re Go,*
651 B.R. 891 (Bankr. D. Nev. 2023) ...............................................8

*In re Kangas,*
46 B.R. 102 (Bankr. D. Minn. 1985) ..............................................21

*In re Norwest Bank Metrowest National Association,*
396 N.W.2d 896 (Minn. Ct. App. 1986) ..........................................19

*Kier v. Ocwen Loan Servicing, LLC,*
122 F. Supp. 3d 786 (N.D. Ill. 2015) ..........................................9, 12

*Klein v. Credico Inc.*,
    922 F.3d 393 (8th Cir. 2019) ................................................................26

*Mohamad v. Palestinian Authority*,
    566 U.S. 449 (2012) ...........................................................................5

*Moore v. Carlson*,
    128 N.W. 578 (Minn. 1910).................................................................18

*Nelson v. Saxon Mortgage, Inc.*,
    2014 WL 186163 (D. Minn. 2014) .......................................................20

*O'Connor v. Schwan*,
    251 N.W. 180 (Minn. 1933) ...............................................................22

*Peaslee v. Ridgway*,
    84 N.W. 1024 (Minn. 1901)................................................................17

*Peugh v. Davis*,
    96 U.S. 332 (1877)...........................................................................22

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ...........................................................................8

*Radel v. Plath*,
    1989 WL 17598 (Minn. Ct. App. 1989).................................................17

*Randall v. Ditech Financial, LLC*,
    23 Cal. App. 5th 804 (2018)................................................................20

*Richards v PAR, Inc.*,
    954 F.3d 965 (7th Cir. 2020)...............................................................26

*Rossman v. Fleet Bank (R.I.) National Association*,
    280 F.3d 384 (3d Cir. 2002) .................................................................9

*Ruiz v. 1st Fid. Loan Servicing, LLC*,
    829 N.W.2d 53 (Minn. 2013) ............................................ 17, 18, 19, 20

*SEC v. Edwards*,
    540 U.S. 389 (2004) ......................................................................9, 10

*Sheasgreen Holding Co. v. Dworsky*,
    231 N.W. 395 (Minn. 1930)..................................................17

*Stapp v. Bank of America, N.A.*,
    2013 WL 1313160 (E.D. Tex. 2013) ..................................... 8

*Stipe v. Jefferson*,
    257 N.W. 99 (Minn. 1934) .................................................. 22

*Swain v. Lynd*,
    76 N.W. 958 (Minn. 1898)..................................................17

*United States v. Goad*,
    788 F.3d 873 (8th Cir. 2015)................................................ 4

**Statutes**

15 U.S.C. § 1639f ................................................................*passim*

15 U.S.C. § 1692f..........................................................15, 20, 26

15 U.S.C. § 1692k ......................................................................26

Minn. Stat. § 336.9-609 ..........................................................25

Minn. Stat. § 580.02 ........................................................*passim*

Minn. Stat. § 580.03 ..................................................................24

Minn. Stat. § 580.30 ........................................................*passim*

Tex. Prop. Code § 51.002 ........................................................24

Va. Code § 55.1-321 ..................................................................24

**Other Authorities**

*Fail, Webster's New World Dictionary* (3d ed. 1994)........................5

Restatement (Third) of Property: Mortgages § 3.1 ...................... 22

## INTRODUCTION

To defend the judgment below, MidCountry and Taft are forced to embrace two counterintuitive propositions. First, MidCountry asks this Court to construe TILA—which MidCountry acknowledges was enacted to combat artificial late fees—to allow mortgage servicers to assess *late* fees for *timely* payments. In MidCountry's view, TILA only prohibits servicers from "intentionally delay[ing]" an "initial credit[]" of a payment. On that theory, so long as a servicer credits a payment as timely at one point, it is free to later undo that credit, pretend payment never occurred, and assess a late fee—precisely what happened to Sandra here.

This Court should reject that illogical interpretation. It depends on concepts— "intentional delay" and "initial crediting"—that are found nowhere in the statute's text. TILA, instead, simply bars servicers from "fail[ing] to credit" payments "as of" the date of receipt and then charging a late fee. *See* 15 U.S.C. § 1639f(a). So the better reading is that a servicer, like MidCountry, that does not credit a payment "fail[s] to credit" the payment. That interpretation also accords with common sense: It means that a servicer cannot charge a late fee when payment is timely.

Second, Taft defends the dismissal of Sandra's FDCPA claim by arguing that a firm conducting an invalid foreclosure—that is, illegally taking a person's home— nonetheless has a "present right to possession" under Minnesota law. To get there, Taft asserts that a "present right to possession" accrues under Minnesota law when

Minn. Stat. § 580.02—which sets out requirements to *begin* a foreclosure-by-advertisement—is satisfied and that it persists unless those "requisites" are negated. Taft concedes that Minnesota law imposes other requirements (including not just the reinstatement right at issue here but also basic notice) that, if violated, invalidate the foreclosure. But Taft contends that, despite that consequence, those mandates are mere "procedural" niceties that cannot affect the present right to possession.

Taft's "requisite"-"procedural" distinction is drawn from whole cloth. Neither Minn. Stat. § 580.02 nor the only two Minnesota-foreclosure cases that Taft cites provide that a "present" right to possession exists no matter what violations occur after a foreclosure proceeding commences. In fact, Minnesota law is the opposite: Violations of the mandatory so-called "procedural" requirements invalidate and void foreclosures just as much as violations of § 580.02. And if a party cannot lawfully foreclose, it cannot claim a "*present*" right to possession when it does so illegally.

Taft's novel theory is also an especially poor fit for this case. Taft admits that the absence of a default (a "requisite") defeats a "present right to possession." But the reinstatement right at issue exists to allow homeowners to cure defaults. Taft thus claims that it retained a "present right to possession" by illegally preventing Sandra from negating it. Our brief (at 43) asked why the law would reward unlawful behavior that way. Taft dodged that question, but this Court shouldn't. The answer is that Minnesota law doesn't countenance Taft's tactics. This Court should reverse.

# ARGUMENT

**I. MidCountry's defense of the district court's dismissal of Sandra's TILA claim conflicts with the statute's text and the complaint's allegations.**

As our opening brief explains, the district court erred in dismissing Sandra's TILA claim based on MidCountry's failure to credit her timely payments. TILA makes it unlawful for a mortgage servicer to "fail to credit a payment to the consumer's loan account as of the date of receipt" and then assess a late fee. 15 U.S.C. § 1639f(a). Here, MidCountry assessed late fees in March 2022 because it was not crediting—*i.e.*, "fail[ing] to credit"—timely payments that Sandra had made in December 2021 and February 2022. That conduct violates § 1639f, which establishes a straightforward rule: If a consumer makes a timely payment, the consumer cannot be assessed a late fee. The district court was therefore wrong to hold that MidCountry had not violated TILA because it initially credited the payments before later undoing the credits.

To defend that result, MidCountry offers two strained interpretations: First, that TILA permits this type of late fee and, second, that the complaint's allegations do not actually plead the assessment of a late fee. Both fail.

**A. Section 1639f does not permit servicers to assess late fees for timely payments.**

MidCountry asserts (at 28–29) that § 1639f should be interpreted to only prohibit a servicer from "intentionally delaying" the "initial[] credit[ing]" of a

payment. That reading is at odds with every relevant tool of statutory interpretation—the text of TILA, its structure, and common sense.

**The text.** Statutory analysis "always" "begin[s]" with the text. *See United States v. Goad*, 788 F.3d 873, 875 (8th Cir. 2015).[1] But MidCountry largely runs from it. The bank has almost nothing to say about the text-based interpretation we provided. And it supports its own proposed interpretation not in the statutory text but in congressional intent and misguided policy concerns.

**1.** As our opening brief demonstrates (at 24–26), the text of § 1639f is straightforward.[2] The statute makes it unlawful for a servicer to "fail to credit" a

---

[1] Unless noted, internal quotation marks, citations, and alterations have been omitted from quotations.

[2] For ease of reference, § 1639f states in full:

(a) In general

In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency, except as required in subsection (b).

(b) Exception

If a servicer specifies in writing requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, the servicer shall credit the payment as of 5 days after receipt.

payment "as of" the date of receipt unless the servicer does not assess a "charge"—like a late fee—because the payment was not properly credited. 15 U.S.C. § 1639f(a).[3]

MidCountry violated that prohibition here. MidCountry assessed late fees. App. 192, R. Doc. 31 ¶ 45; App. 101–02, R. Doc. 9-13. And when MidCountry assessed those fees, it did so because it was not crediting Sandra's timely December and February payments. App. 186, R. Doc. 31 ¶ 1; App. 198, R. Doc. 31 ¶ 88. To not credit the payments is to "fail to credit" them in violation of the statute. *See, e.g.*, *Fail*, *Webster's New World Dictionary* (3d ed. 1994) ("fail" means "to be deficient or negligent in an obligation, duty, or expectation").

Our brief further explains (at 28–29) that the duty to not "fail to credit" is ongoing and applies when a late fee is assessed, not just when a payment is first received. That's shown by § 1639f's command to credit payments "as of" the date of receipt, rather than just "on" the date of the receipt. And it's shown by common usage: When a command has continuing effect, it requires continued compliance. *See Mohamad v. Pal. Auth.*, 566 U.S. 449, 454 (2012) (statutes should be construed consistent with "everyday parlance"). So a mandate to post a sign doesn't permit immediately tearing it down; to wear goggles doesn't permit taking them off a moment after putting them on; and to credit a payment "as of" the date it's sent

---

[3] The statute also prohibits reporting negative credit information. That type of injury is not at issue on appeal.

doesn't permit crediting and then later uncrediting. In each situation—and numerous others one could draw from everyday life—ordinary listeners understand that the command is not fleeting because temporary compliance would invite the exact harm that the command is designed to avoid.

**2.** MidCountry accuses us (at 29–30) of "fail[ing] to cite any language within Section 1639f(a)" to support this interpretation, but the bank can levy that charge only by ignoring the arguments just recounted. MidCountry never attempts to explain how, when it assessed the fees on Sandra, it somehow was not, as a matter of plain text, "fail[ing] to credit" her payments. Nor does it address that an ordinary reader would understand the command to not "fail to credit" to be a continuing one. And although the bank asserts (at 34–35) that its reading does not change the meaning of "as of" to "on," the only reason it provides is what was "explained before"—but nothing earlier in MidCountry's brief addresses that point.

The sole textual basis MidCountry offers (at 30–31) to challenge our interpretation is the assertion that we conflate the term "credit" with "deposit" or "acceptance." It's unclear how MidCountry arrives at that conclusion. Our brief (at 7) specifically disclaimed that § 1639f imposes an obligation to "deposit" funds. Indeed, because § 1639f(a)'s general rule doesn't apply when no fee is charged, the statute doesn't even impose a universal obligation to "credit." MidCountry is even further afield in claiming that our interpretation substitutes in the word

"acceptance," which MidCountry defines (at 30) as an "offeree's assent … so that a binding contract is formed." Our argument has nothing to do with contract formation.

**3.** MidCountry's defense of its own interpretation is just as thin. Tellingly, MidCountry points to nothing in the statute's text for its rule that a servicer who "initially credits" a payment rather than "intentionally delays" has done everything that § 1639f requires. Instead, relying solely on *Fridman v. NYCB Mortgage Co.*, 780 F.3d 773 (7th Cir. 2015), MidCountry contends (at 27–29) that, because Congress's focus was intentional delay in initial crediting, the statute's reach is confined to that concern as well.

Statutory interpretation, however, turns on text, not legislative intent. And § 1639f prohibits simply "fail[ing]" to credit. It doesn't mention "initial crediting" or "intentional delay"—standards that would both allow servicers to credit payments on Monday but uncredit them on Tuesday and excuse servicers who are merely negligent in delaying. Rather than express that narrow focus, the statute makes it unlawful *any* time a servicer "fail[s]" to properly "credit" a payment and then charges a fee. 15 U.S.C. § 1639f(a). Resort to "arguments based on statutory purpose" is improper when, as here, the "expansive text of the statute" is "clear." *Boyle v. United States*, 556 U.S. 938, 950 (2009).

MidCountry's appeal to *Fridman*'s description of the intent underlying § 1639f is flawed for other reasons, too. To start, *Fridman* merely explains that "*an* important purpose" of TILA is combatting fees based on "delay." 780 F.3d at 779.[4] (emphasis added). The Seventh Circuit never declared that the statute reaches no other fact patterns—nor did it have any reason to since the case in front of it was about delay, *id.* at 774, not the credit-then-reverse tactic presented here.[5]

But, given the statute's text ("fail to credit"), it wouldn't matter even if Congress was principally, or even solely, focused on "initial crediting" and "intentional delay." "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity"—let alone, as MidCountry claims, demand a narrow interpretation. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001). Rather, "[i]t demonstrates breadth." *Id.* Even MidCountry's sole TILA authority besides *Fridman* recognizes that the statute applies to more than just

---

[4] MidCountry notably does not limit its interpretation to the problem on which *Fridman* focuses—"delay"—and instead introduces the additional concepts of "initial crediting" and "intentional" delay. Presumably, that is because MidCountry did delay in crediting Sandra's account. Just like a train that briefly leaves the station platform only to head back is still delayed in its departure, a servicer that briefly credits a payment before undoing it is still delayed in crediting.

[5] *See also, e.g.*, *In re Go*, 651 B.R. 891, 907 (Bankr. D. Nev. 2023) ("[E]ven though Rolando continued to make timely monthly payments, … 21st Century would unilaterally reverse the payments received for the prior month, and then would charge a late fee."); *Stapp v. Bank of Am., N.A.*, 2013 WL 1313160, at *5 n.4 (E.D. Tex. 2013) (plaintiffs alleged "they were assessed late fees after certain payments were reversed").

delay. *See Kier v. Ocwen Loan Servicing, LLC*, 122 F. Supp. 3d 786, 791 (N.D. Ill. 2015) ("Nowhere in the Amended Complaint does Kier allege that Defendants *delayed* processing his payment *or refused* to credit his payment 'as of the date of receipt.'" (emphasis added)).

And that breadth makes sense. Charging a late fee after crediting and then un-crediting a payment imposes the same harm as intentionally delaying in the first instance. If MidCountry's interpretation were correct, the statute's protections would be easily avoided. But courts do not interpret statutes to allow them to be so effortlessly evaded unless "compelled by the language." *SEC v. Edwards*, 540 U.S. 389, 395 (2004); *see also, e.g.*, *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 392, 399 (3d Cir. 2002) (refusing to interpret TILA in a manner that would allow lender to "circumvent" its requirements). That's not the case here.

\* \* \*

In the end, MidCountry cannot escape § 1639f(a)'s straightforward text, as demonstrated by a basic question that we posed in the opening brief (at 25) and that MidCountry studiously avoids: On the date MidCountry imposed the late fees, were Sandra's payments "credit[ed]" or (to borrow from MidCountry's preferred dictionary) "enter[ed] (as an amount) on the credit side of [her] account"? Because the answer is no, MidCountry violated the plain text of § 1639f(a).

***Statutory context.*** Our opening brief also demonstrates (at 26–27) that a straightforward interpretation of § 1639f(a)'s text aligns with its neighboring provision, § 1639f(b). Under § 1639f(b), if a consumer fails to follow a servicer's written instruction for submitting payments, when the servicer accepts the payment, it may delay crediting only by five days after the date of receipt. That avoids longer delays that would increase the odds of a late fee. As we explained, if the district court's and MidCountry's interpretation were correct, that constraint on banks could be easily evaded by "initially" crediting the payments and then undoing and rejecting the credit (either returning the money entirely or simply keeping the money and just declaring a new credit date) once the trigger for a late fee passes. Our interpretation, by contrast, precludes that gamesmanship by recognizing that the credit-then-reverse tactic violates § 1639f(a).

MidCountry does not deny this consequence. Instead, it argues (at 32) that it is simply a function of the statute not "contain[ing] language" that precludes servicers from "initially credit[ing]" a payment and then reversing it. But as just explained, the statute *does* contain language that bars that practice.

The choice between these competing interpretations—one that respects the constraints of § 1639f(b) (ours) and one that undermines them (MidCountry's)—is simple. Again, courts do not interpret statutes to contain such blatant loopholes unless "compelled" to do so. *Edwards*, 540 U.S. at 395.

***Common sense***. The same conclusion follows when one considers common sense: Our interpretation aligns with it while MidCountry's conflicts with it. As noted above, our interpretation sets up a sensible rule: When a consumer makes a timely payment, a servicer cannot charge a late fee. That approach fits within a statute aimed at prohibiting servicers from manufacturing late fees when there is no late payment. By contrast, MidCountry's interpretation allows servicers to charge late fees for timely payments.

Here, again, MidCountry does not disclaim this result. To the contrary, it agrees that, once a servicer "initially" credits a payment, it is free to later undo that credit and charge a late fee. And although MidCountry refunded Sandra's payments when it reversed the credits, nothing in the bank's interpretation prevents a servicer from simply undoing the accurate "initial credit" date while keeping the money and charging a late fee.

To justify that reading, MidCountry claims that it's a necessary byproduct of avoiding the supposedly even graver ramifications of our interpretation. If we're right, MidCountry says (at 33–34), that would "require[] servicers to waive any default rights" and force them to accept, rather than refund, payments after a default, yielding "immediate, reverberating, and damaging consequences that substantially alter thousands, if not millions, of loan agreements."

MidCountry does not explain why keeping payments results in a waiver of default—rather than just lowering the loan balance as foreclosure approaches—or why this would harm the servicer (who would keep payments) rather than the consumer (who would lose payments along with the home). Regardless, MidCountry's parade of horribles misunderstands the statute. It does not prohibit creditors from "fail[ing] to credit" payments as of the date of receipt in *all* circumstances. Rather, it prohibits "fail[ing] to credit" "*except*" when doing so "does not result in any charge to the consumer." 15 U.S.C. § 1639f(a) (emphasis added); *see also Kier*, 122 F. Supp. 3d at 791. MidCountry (and any other servicer) is free to return payments and to never enter a credit; we have never claimed otherwise. All that MidCountry cannot do is not credit a timely payment—whether "initially" or by "undoing" it—*and* then charge a late fee for what was a timely payment.

## B. Sandra adequately alleged that MidCountry charged her a late fee.

MidCountry also cannot salvage the district court's conclusion that Sandra did "not allege that MidCountry's actions caused her to incur late charges." As our opening brief recounts (at 30–31), the complaint squarely alleges that MidCountry "illegally assessed late charges"—a charge that, Sandra explained to the district court, resulted from the bank "backfill[ing] the accounting" with "retroactive[]" and "improper late fees" after "revers[ing]" her credits. App. 192, R. Doc. 31 ¶ 45; App. 162, R. Doc. 19 at 13.

MidCountry offers two reasons why the district court was nonetheless right to dismiss her claim. The first (at 37–38) is that the district court was justified in construing the allegation of "late charges" as alleging costs tied to the foreclosure sale because the complaint's preceding paragraphs are about the foreclosure. But that's just a function of the complaint proceeding in chronological order: First, the foreclosure process began, and then Sandra had to pay to get her home back, including by paying the late charges resulting from the uncrediting of her payments. Putting allegations in date-order didn't forfeit Sandra's right to have the complaint's allegations construed in her favor.

And notably, in pressing this argument, MidCountry still cannot identify any real-world "late charge" that could come from a foreclosure sale. If nothing else, the district court erred in construing Sandra's complaint to allege a fee that doesn't exist rather than the one that the statute she cited is designed to address.

MidCountry's second argument (at 38–39), which the district court never endorsed, is no better. It claims a right to charge a late fee, regardless of TILA's scope, because Sandra's December payment was "late" and the February payment was "incomplete."[6]

---

[6] MidCountry suggests (at 39) that the December and February payments have been "belatedly" raised and were "not alleged." That is incorrect. *See, e.g.*, App. 16, R. Doc. 1 ¶ 38; App. 219–20; R. Doc. 33 at 15–16.

That's wrong. Although the December payment was made on December 29 rather than December 26 (the due date), payment still fell within the mortgage's grace period. App. 80, R. Doc. 9-7 at 3. MidCountry even acknowledges (at 8 n.3) that it was entitled to assess late fees only if payment "is not received by us within 16 days after the 'Payment Due Date.'" Sandra's came within three days, so, had MidCountry properly credited the payment, there would be no basis to assess a fee.

As for the February payment, MidCountry does not dispute that Sandra timely paid the principal and interest due, but it says (at 9) that her payment didn't cover a "force placed insurance" fee. Even if accurate (the complaint doesn't allege this), it wouldn't justify dismissal. TILA prohibits late fees that "result" from a failure to credit. 15 U.S.C. § 1639f(a). Here, MidCountry never assessed a fee for not covering any (improper) fee for force placed insurance; it assessed the fee only once it uncredited Sandra's principal and interest payments. That's reflected in the timing of the late charges: Whereas MidCountry ordinarily assessed late fees in the second week of the month, *see* App. 101–02, R. Doc 9-13 (showing late fees on November 12, December 13, and February 11), it never assessed a late fee in the second week of March because of the failure to cover force placed insurance costs. Instead, MidCountry assessed late fees at the end of March only once the credits were reversed. *Id.* That means the "fail[ure] to credit" impermissibly "result[ed]" in a late charge—and that violates TILA.

## II. Taft's defense of the dismissal of Sandra's FDCPA claim conflicts with Minnesota law and FDCPA caselaw more broadly.

Taft likewise cannot justify dismissal of Sandra's FDCPA claim. According to Taft, so long as it *could* engage in a nonjudicial foreclosure—what it calls (at i, 10, 25, 44) a "right to nonjudicially foreclose"—then it had a "present right to possession" regardless of what happened in the *actual* foreclosure that caused Sandra harm. And that "right to nonjudicially foreclose," Taft says, is governed solely by what it calls the "requisites" for foreclosure found in Minn. Stat. § 580.02. *E.g.*, Resp. Br. at 11, 25, 41. Taft brushes aside the remainder of Minnesota's mandatory requirements as mere "procedural" requirements that cannot affect the "present right to possession"— even though, if those requirements are violated, the foreclosure is rendered invalid and void—because they do not prevent a mortgagee from trying again to foreclose.[7] The end result of Taft's theory is that a party engaging in an *illegal* foreclosure under Minnesota law has a "*present*" right to possession.

That is incorrect. What matters under the FDCPA is not whether a debt collector has an abstract right to engage in a nonjudicial foreclosure, but whether it has a "*present* right to possession" when it takes "nonjudicial action" to dispossess the debtor of her property. *See* 15 U.S.C. § 1692f(6)(A). And on that question, Minnesota

---

[7] Taft attempts (at 51) to locate its theory in the decision below, asserting that "Judge Tostrud correctly observed" these points. But Taft offers no record cite, and its argument departs from the opinion below.

law is clear: Even if a mortgagee satisfies the conditions of § 580.02 to begin the foreclosure process, it loses the right to continue the foreclosure—and, with it, the right to "*present*" possession—if it violates mandatory state law requirements. That does not mean that the mortgagee loses its right entirely to take the property (just as a car lender still has a right to repossess a car even if its first attempt results in a breach of peace), but it does mean it has no "*present*" right to possession to allow the continued taking of property.

Taft's novel contrary argument finds no support in Minnesota law or the caselaw governing the "present right to possession" more broadly.

## A.   Taft's "requisite"-procedure distinction has no footing in Minnesota law.

Taft's argument that only violations of § 580.02 can strip a party of the present right to possession rests on a single clause in the statute and just two cases. The statute provides that, "[t]o entitle any party to make such foreclosure, it is requisite" that the section's five requirements—default; no pending lawsuit to recover debt; recordation of the mortgage; notice of pre-foreclosure counseling; and loss-mitigation efforts— be satisfied. Taft asserts (at 41–42, 47–48) that this language means that, if there is "satisfaction of the statutory 'requisites,'" then the secured party has an unassailable right to foreclose and thus a "present right to possession." The only support that Taft offers (at 41–42) for that claim is that the Minnesota Supreme Court has said that § 580.02 sets forth "conditions [to] be met" to foreclose, *Ruiz v. 1st Fid. Loan Servicing,*

*LLC*, 829 N.W.2d 53, 57 (Minn. 2013), and that these conditions must be met when "the first step is taken in the foreclosure," *Adlinger v. Close*, 201 N.W. 625, 626 (Minn. 1925).

Neither the statute's text nor the sparse caselaw Taft cites demonstrates what Taft must show for the judgment below to be correct: that a mortgagee maintains a "present right to possession" if it subsequently violates mandatory foreclosure requirements. Start with the text of § 580.02. That it is "requisite" that the provisions of § 580.02 be satisfied for a party to *begin* a foreclosure means just that—a party cannot commence a foreclosure without satisfying those requirements. But it doesn't resolve whether a "present" right to possession persists no matter what happens after the foreclosure commences.

Minnesota law elsewhere does, however. It has long treated other provisions of the foreclosure laws outside of § 580.02's "requisites" as mandatory and held that foreclosures that violate them are invalid and void—meaning that the foreclosing party has no "right" to foreclose and thus to take possession. This includes, among other things, violating notice requirements, *see, e.g.*, *Peaslee v. Ridgway*, 84 N.W. 1024, 1025 (Minn. 1901) (improper description in notice); *Swain v. Lynd*, 76 N.W. 958, 959 (Minn. 1898) (failure to serve); power-of-attorney requirements, *see, e.g.*, *Sheasgreen Holding Co. v. Dworsky*, 231 N.W. 395, 395–96 (Minn. 1930); and, of course, reinstatement rights, *see, e.g.*, *Radel v. Plath*, 1989 WL 17598, at *2 (Minn. Ct. App. 1989)

(unpublished). And when a foreclosure "must be held void," the foreclosing party "acquire[s] no right of possession under it." *Coles v. Yorks*, 17 N.W. 341, 342 (Minn. 1883). Nothing in these (and other) cases suggests that Minnesota treats only violations of § 580.02's "requisites" as capable of eliminating the present right to possession.

Taft's minimal caselaw only supports that conclusion. *Ruiz* concerned whether § 580.02(3), which governs the recording of assignments, fell within the "strict compliance standard" that the Minnesota Supreme Court had previously articulated such that a failure to comply voids a foreclosure. 829 N.W.2d at 56. To answer that question, and thus to "determine the effectiveness of the foreclosure in th[e] case," the court looked to the "relevant statutory language." *Id.* at 57. Because recording is a "requisite" and "requisite" means "required," the court determined that the statute "unambiguously mandates strict compliance." *Id.* at 58. But that didn't mean that the "requisites" of § 580.02 received special treatment under Minnesota law. Rather, it meant they received the same treatment as other mandatory provisions for which the court had "articulated a strict compliance standard," one of which was about notice, not any "requisite" of § 580.02. *See id.* at 56 (citing *Moore v. Carlson*, 128 N.W. 578, 579 (Minn. 1910)).

*Adlinger* is in accord. It did hold, as Taft observes, that the "requisites" of § 580.02's predecessor statute had to be satisfied "when the [foreclosure's] first step is taken." 201 N.W. at 626. But that wasn't because of a tacit rule that no other

requirements of the nonjudicial foreclosure laws need to be satisfied for a present right to possession to exist when the *last* step is taken. Rather, it was because, if the requisites are not satisfied before the first step (notice), then the mandatory notice period would be rendered pointless. *See id.* at 625. As the court put it, "[t]he first publication of the notice is as necessary as the last to the validity of the foreclosure." *Id.*

So, nothing in *Adlinger*, *Ruiz*, or § 580.02's text undermines the common-sense reading of Minnesota law on which Sandra's claim rests: A mortgagee that is engaged in an invalid foreclosure—*i.e.*, illegally taking property—has no "present" right to possession.

**B.    Minnesota law does not permit debt collectors to maintain a "present right to possession" by preventing homeowners from curing defaults.**

Beyond the general lack of support for Taft's "requisite"-procedure distinction, it is particularly ill-suited for this case. The reinstatement right provided for in § 580.30 is not a mere "procedural" right divorced from § 580.02's requisites. Section 580.30 provides a substantive right to cure the default—one of § 580.02's "requisites"—before a foreclosure sale. If the proper amount is tendered, the mortgagee has no discretion to do anything but "reinstate the mortgage and abandon foreclosure proceedings." *In re Norwest Bank Metrowest Nat'l Ass'n*, 396 N.W.2d 896, 899 (Minn. Ct. App. 1986). The procedural components of § 580.30 (the right to

request the payoff amount and the mandate to provide it) simply facilitate that substantive right to cure the default. As one court put it, the "absolute right to reinstatement" under § 580.30 "would be meaningless if a lender could simply refuse to provide the borrower with the amount required to reinstate the loan, or provide the amount long after the borrower had requested a reinstatement amount." *Nelson v. Saxon Mortg., Inc.*, 2014 WL 186163, at *11 (D. Minn. 2014).

So, even if Taft were correct that the "requisites" of § 580.02 receive different treatment, the reinstatement right of § 580.30 is inexorably linked to the default requirement in § 580.02: It exists solely to allow homeowners like Sandra to eliminate that requisite. Once that is done, any continued foreclosure proceedings would, even under Taft's interpretation, occur without a present right to possession. *See also, e.g.*, *Randall v. Ditech Fin., LLC*, 23 Cal. App. 5th 804, 811 (2018) ("refus[al] to halt" foreclosure after the plaintiff "reinstated his loan" violates § 1692f(6)); *Amodio v. Ocwen Loan Servicing, LLC*, 2019 WL 2162944, at *4 (M.D. Tenn. 2019) (because loan was "reinstated," there was no "ongoing right of possession"). For Taft to be correct, then, Minnesota law would need to reward the obstruction of the right to reinstate with retention of the "present" right to possession.

It does not. That's made clear, as in *Ruiz*, by the statute's "precise language." 829 N.W.2d at 57. Once a payoff statement is requested, it must be provided to the mortgagor "at least three days prior to the date of the completed sheriff's sale." Minn.

Stat. § 580.30(1). The "foreclosure is not invalidated" only if that requirement is satisfied. *Id.* The use of "*is* not invalidated" rather than "may not be invalidated" makes clear that violations like the one here necessarily "invalidate[]" the foreclosure—a consequence incompatible with the foreclosing party maintaining a "present" right to possession.

Section 580.30's other subsection reinforces that conclusion. It allows a request for the payoff amount to be made through the sheriff overseeing the foreclosure sale. Minn. Stat. § 580.30(2).[8] And if the foreclosing party does not respond, then the sheriff "shall postpone" the sale so that it cannot even be completed. Minn. Stat. § 580.30(2).

Together, these provisions make clear that, just as in *Adlinger*, if the reinstatement right is violated, the "right to proceed" with the foreclosure "is suspended." 201 N.W. at 626; *see also, e.g.*, *Davis v. Davis*, 196 N.W.2d 473, 475 (Minn. 1972) (holding that § 580.30 must be interpreted in "light of the legislative purpose to afford" an "opportunity" to "remov[e] the default").

That conclusion finds further support in the historical background underlying the reinstatement right. Section 580.30 is a "codified" variant of the "common law 'equity of redemption.'" *See In re Kangas*, 46 B.R. 102, 105 & n.2 (Bankr. D. Minn. 1985). The "equity of redemption," though less robust (it required payment of the full

---

[8] The mortgagee has more time to respond to requests under § 580.30(2).

principal and interest rather than just the amount in default, as under § 580.30) was still protected with "jealous care." *O'Connor v. Schwan*, 251 N.W. 180, 181–82 (Minn. 1933). It was "firmly [] established" that the right could not be "bargain[ed] away" "at the time of" the "mortgage transaction." *Id.*; *see also Peugh v. Davis*, 96 U.S. 332, 337 (1877) (describing this as a rule "from which a court of equity never deviates"). Nor could a lender evade it by attempting to structure the transaction as something other than a mortgage. *See, e.g.*, *Stipe v. Jefferson*, 257 N.W. 99, 100 (Minn. 1934); *see also* Restatement (Third) of Property: Mortgages § 3.1 cmt. A (recounting history courts of equity preventing the "clogging [of] the mortgagor's equity of redemption"). And although, after the transaction was entered into, the equity of redemption could be sold, the rule was that "equity will scan [such] sales," "require their fairness to be firmly established," and "closely scrutinize[]" them to "prevent any oppression of the debtor." *O'Connor*, 251 N.W. at 181–82.

Taft's theory is at odds with this history. If Minnesota law did not allow the taking of a home after the wrongful stripping of the less robust equity of redemption, there is no reason to think a mortgagee who wrongfully strips the enhanced statutory reinstatement right still retains the present right to possession so that the home can be taken anyway.

**C.** **Taft's "requisite"-procedure distinction conflicts with numerous cases holding that the failure to follow mandatory state-law requirements for taking collateral cuts off a "present right to possession."**

As our opening brief explains (at 34–37), numerous courts, applying Minnesota and other states' law, have held that a debt collector loses the "present" right to possession if it violates mandatory state-law requirements for taking collateral. Taft cannot shoehorn these cases into its novel framework, and its attempt to do only demonstrates that its theory is gerrymandered for this case, an outlier, and unworkable.

**1.** Consider first the caselaw addressing other states' nonjudicial foreclosure laws. As Sandra's opening brief observes, courts have held that the failure to follow mandatory state-law notice requirements cuts off a foreclosing party's present right to possession. *See, e.g.*, *Barber v. Law Offs. of Thomas J. Burbank*, 2023 WL 4281241, at *5 (E.D. Tex. 2023); *Hill v. Nationstar Mortg. LLC*, 2022 WL 16950025, at *5–6 (E.D. Va. 2022). According to Taft (at 45), these cases fit within its rule because the notice provisions at issue were "fundamental prerequisites" to bring about the foreclosure under the relevant state's law.

That purported distinction—which glosses over notice being "procedural"—does not work. Nothing in the relevant statutes suggests that they are any more "fundamental" or any more of a "prerequisite" to the right to foreclose than what Taft brushes aside (at 12–13) as the "non-'requisite' procedural" requirements of

Minnesota law. To be sure, each statute uses mandatory language, but so do the comparable Minnesota laws, including the reinstatement right at issue here.[9] *Compare* Va. Code § 55.1-321 ("the party secured shall give written notice of the time, date, and place of any proposed sale") *and* Tex. Prop. Code § 51.002 ("notice of the sale … must be given at least 21 days before the date of the sale") *with* Minn. Stat. § 580.03 ("Six weeks' published notice shall be given that such mortgage will be foreclosed by sale of the mortgaged premises") *and id.* § 580.30 ("The holder of a mortgage shall inform the mortgagor of the amount necessary to reinstate the mortgage"). Taft's attempt to distinguish these cases reveals that there is no way to identify a "fundamental prerequisite" to foreclosure beyond Taft's own say-so.[10]

**2.** Taft cannot distinguish the many car-repossession cases that Sandra cites either. *See* Opening Br. at 34–36. Shifting away from its newly minted "fundamental prerequisite" standard, Taft claims (at 43–44) that these cases fit within its rule

---

[9] Taft disagrees (at 49) that § 580.30's procedural component can be described as "notice" because the statute does not "specif[y] the precise contents of the 'notice.'" Because Taft doesn't actually defend the district court's distinction of these cases as "notice" cases, the dispute is immaterial. But § 580.30 does mandate the content: "the amount necessary to reinstate the mortgage."

[10] Taft argues (at 46) that Sandra's other authority, *Bohannon v. PHH, Mortg. Corp.*, 2012 WL 12844753 (N.D. Ga. 2012), turned on the lack of an enforceable security interest, not notice. But *Bohannon* rejected the plaintiffs' argument "regarding [a] lack of standing to foreclose." *Id.* at *10. The court discussed the *timing* of the assignment of the security interest precisely because it demonstrated that the mandatory notice period was violated. *See id.* at *14.

because the prohibition on breaching the peace is a "statutory requirement" to "pursue nonjudicial repossession" and the UCC contains "no additional procedural provisions."

This fails, too. The UCC is clear that the only requirement "to pursue" nonjudicial repossession is a default. Take Minnesota's statute. Subsection (a) provides that "[a]fter default, a secured party" "may take possession of the collateral." Minn. Stat. § 336.9-609(a). Subsection (b) then provides two different *procedural* options to do so:

(b) Judicial and nonjudicial process. A secured party may proceed under subsection (a):

(1) pursuant to judicial process; or

(2) without judicial process, if it proceeds without breach of the peace.

*Id.* § 336.9-609(b). In other words, not breaching the peace is part of *how* a debt collector takes property; it is not a pre-condition to being allowed to take it in the first instance. The only "substantive" requirement is default. To the extent that Taft means to say that the UCC somehow elevates the procedural breach-of-the-peace provision to a "substantive" "requisite," it again offers no way to identify why that is so and makes no attempt to explain why the many statutory mandates in Minnesota's nonjudicial foreclosure laws aren't "statutory requirements" under Taft's novel framework.

### D. This case will not unduly expand the FDCPA.

Finally, Taft is wrong to assert (at 50) that reversal would be counter to this Court's warning that the FDCPA "was not meant to convert every violation of a state debt collection law into a federal violation." *Klein v. Credico Inc.*, 922 F.3d 393, 397 (8th Cir. 2019). While true that, as a general matter, the FDCPA doesn't federalize every state-law violation, *see id.*, some "specific provisions [of the FDCPA] … do call for an inquiry into state law." *Richards v PAR, Inc.*, 954 F.3d 965, 969 (7th Cir. 2020). Section 1692f(6)(A), as Taft admits (at 41), "is one of them." *Id.*; *see also, e.g.*, *Hill*, 2022 WL 16950025, at *5. After all, Taft's theory is that, if the Minnesota legislature labels something a "requisite," then a violation of state law violates the FDCPA, too.

Of course, Sandra's position isn't that *every* violation of Minnesota law violates § 1692f(6)(A). *See* Opening Br. at 44 (providing examples that don't). But everything in Minnesota law supports the conclusion that flouting the reinstatement right does.[11] And whatever limits there may be on state law generating FDCPA liability, it should be clear that Taft's conduct here—falsely telling a homeowner that it would provide the information needed to cure a default, never doing so, and then taking her home anyway—counts as the type of "unfair" and "unconscionable" debt-collection practices that Congress wanted to eliminate.

---

[11] Of course, establishing a violation of § 1692f(6)(A) doesn't automatically establish liability. The plaintiff must still prove damages, and the defendant can raise a "bona fide error" defense for certain unintentional mistakes. 15 U.S.C. § 1692k(c).

# CONCLUSION

This Court should reverse.

Respectfully submitted,

/s/ Robert D. Friedman
MATTHEW W.H. WESSLER
ROBERT D. FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
robert@guptawessler.com

CARL ERIC CHRISTENSEN
CHRISTOPHER WILCOX
CHRISTENSEN SAMPSEL PLLC
305 Fifth Avenue, North,
Suite 375
Minneapolis, MN 55401
(612) 473-1200
carl@christensensampsel.com
chris@christensensampsel.com

THOMAS JOHN LYONS, JR.
CONSUMER JUSTICE CENTER, P.A.
367 Commerce Street
Vadnais Heights, MN 55127
(651) 770-9707

June 27, 2025                           *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,499 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

June 27, 2025

*/s/ Robert D. Friedman*
Robert D. Friedman

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Robert D. Friedman*
Robert D. Friedman
